Hurman Lee TURNER,
Plaintiff-Appellee,

v.

COSTA LINE CARGO SERVICES, INC.,
Defendant-Appellant.

No. 83–2422.

United States Court of Appeals,
Fifth Circuit.

Oct. 25, 1984.

Ben L. Reynolds, Howard R. King, Houston, Tex., for defendant-appellant.

Jamail, Kolius & Mithoff, Marty R. Akins, Joseph D. Jamail, Houston, Tex., for plaintiff-appellee.

Before GEE, RANDALL, and JOHNSON, Circuit Judges.

JOHNSON, Circuit Judge:

Hurman Lee Turner, a longshoreman, instituted this action against Costa Line Cargo Services, Inc. (Costa Line), a vessel owner, under section 5(b) of the Longshoremen's and Harbor Workers' Compensation Act[1] seeking redress for injuries sustained when Turner slipped and fell aboard the M/V CORTINA, a vessel owned by Costa Line. The case was tried to the district court, which issued thorough findings of fact and conclusions of law holding Costa Line liable for Turner's injuries and awarding Turner $181,575.00 in damages. Costa Line appeals to this Court alleging that the district court misinterpreted existing precedent on the duty owed by a ship owner to a longshoreman once stevedoring operations have begun and that the district court's fact findings are clearly erroneous. This Court affirms the district court's judgment.

I. Background and the District Court's Fact Findings

Costa Line's vessel, the M/V CORTINA, arrived in Houston, Texas on Sunday, January 25, 1981, and its contract stevedore, Strachan Shipping Company, commenced loading operations which continued through the following day. On the following Tuesday, the vessel was shifted to another dock and the stevedore continued operations to complete unloading and to load and secure new cargo.

On the following Friday, at 7 a.m., Hurman Turner came aboard the M/V CORTINA for the first time as a member of the cargo-securing crew. It is undisputed that he had not served with the earlier stevedore crews. When the crew arrived on the scene, both Turner and his foreman, a Mr. Goatcher, testified that they observed a

---

**1.** 33 U.S.C. § 905(b):

(b) In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed by the vessel to provide ship building or repair services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing ship building or repair services to the vessel. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

pile of debris—dunnage—just aft of the number 4 hatch. The dunnage consisted of board, rags, sawdust and oil or grease. The dunnage was leaking oil across the deck. Significantly, the court found that the pile of dunnage and its associated slick were not in the work area of the securing gang for the number 4 hold; the dunnage and oily slick were on the main deck aft of the number 4 hold and against the engine room. Turner's duties, as deck man for the securing gang, included obtaining the gear that the gang needed in order to secure the cargo. Both Goatcher and Turner testified that this gear customarily is available to a gang by the hatch where a gang is working. In this case, however, the gear was not by the hatch but instead was aft from where the gang was working. Consequently, Turner was required to make three or four trips across the oily area in order to secure the gang's gear. On the last of these trips, Turner slipped and fell in the oily area at 7:15 a.m. Goatcher testified that even in the brief period of time before the injury to Turner, he asked the crew of the M/V CORTINA to clean up the slippery condition and repeatedly called the problem to the attention of a ship's officer. Goatcher related that the first of these occasions was at 7:03 a.m., and that he received the response, "in a moment."

After hearing the evidence, observing the witnesses and examining the documentary evidence, the district judge, as finder of fact in the instant case, made the following relevant findings:

A pile of dunnage composed of boards, rags, sawdust and oil or grease was stacked on the main deck aft of the no. 4 hold against the engine room. The pile of dunnage was the source of the slippery substance aft of the no. 4 hold. The pile of dunnage and its associated slick

were present on the M/V CORTINA prior to Turner's boarding the vessel at 7:00 A.M., Friday, January 30, 1981. The pile of dunnage and its associated slick were not in the work area of the securing gang for the no. 4 hold.

No members of the crew of the M/V CORTINA warned any members of the securing gang for the no. 4 hold of the existence of the pile of dunnage and the slippery main deck area. Harold Goatcher, gang foreman for the securing gang, twice requested the crew of the M/V CORTINA to clean up the slippery condition.

At approximately 7:15 A.M. on Friday, January 30, 1981, Turner slipped in the oil or grease from the pile of dunnage aft of the no. 4 hold. Turner's injuries were the result of his fall on the M/V CORTINA and not due to any prior injuries or ailments.

The Defendants negligently failed to provide Turner a safe place to work, failed to warn Turner of an unreasonable risk of harm on the M/V CORTINA and failed to remove, eliminate or abate the dangerous condition.

Record Vol. I at 17–18.

▮ Once again, significantly, the district court found that the dunnage and its associated oily slick were not in the work area of the crew. Clearly, the district court concluded as a factual matter that an unreasonably dangerous condition (the oil spill) existed when Turner boarded the vessel,[2] that the stevedore's gang foreman twice expressly urged the vessel owner to eliminate the dangerous condition,[3] and that the vessel owner negligently failed to remove, eliminate or abate the dangerous condition.[4] It is well settled that these fact

---

**2.** Almost immediately after coming on board—within two or three minutes—the first request to eliminate the dangerous condition was made. *See infra,* note 5.

**3.** The urgency of the need for the owner's immediate remedial action would seem to be apparent in that no less than two separate requests were made within a quarter of an hour.

**4.** The record reflects that Turner and the rest of the stevedore's crew boarded the M/V CORTINA at 7:00 a.m. and that the vessel owner received actual notice of the oil slick only two or three minutes after the crew boarded. The dangerous condition was allowed to persist during Turner's entire stay on the ship despite two separate requests for its elimination. In fact, the record reveals that the condition was not

findings must be accepted by this Court unless the findings are clearly erroneous. *See* Fed.R.Civ.P. 52(a); *United States v. United States Gypsum Co.*, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948); and *Hill v. Texaco*, 674 F.2d 447, 450 (5th Cir.1982).

■ The record reveals that the trial court's finding that the vessel owner was repeatedly requested to eliminate the inherently dangerous condition is fully supported by the evidence presented at trial.[5] Undoubtedly, the vessel owner had actual knowledge of the dangerous condition, and it is clear that the dangerous condition was allowed to persist even though the vessel owner was expressly urged to remove the hazard on at least two separate occasions. The trial court's findings in these respects cannot be held to be clearly erroneous and, hence, the district court's findings are upheld. This Court will not substitute its opinion for that of the district court simply because our review of the cold record might lend support to a different interpretation of the facts.

## II. The Trial Court's Fact Findings and Existing Precedent

As we have seen, the district court, as fact finder, concluded (1) that the oily area in which Turner fell was not in the stevedore gang's work area; and (2) that the vessel owner had actual knowledge of the unreasonably dangerous condition prior to Turner's injuries and that the vessel owner failed to remove the hazardous condition even though twice requested to do so. We conclude that both of these findings independently support the district court's judgment under established precedent.

### A. Vessel Owner's Liability for Ship Areas Remaining Within Its Control

■ In *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), the Supreme Court stated: "[T]he shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that *develop within the confines of the cargo operations that are assigned to the stevedore.*" *Scindia*, 451 U.S. at 172, 101 S.Ct. at 1624 (emphasis added). Generally, the vessel owner is entitled to rely on the stevedore to protect his employees from conditions that "develop within the confines of the cargo operations that are assigned to the stevedore." *Id.* However, the vessel owner is not relieved of responsibility for conditions arising outside the area assigned to the stevedore. *See Helaire v. Mobil Oil Co.*, 709 F.2d 1031, 1036 (5th Cir.1983) (the owner has a duty to avoid exposing the longshoremen to harm "from hazards under the act or control of the vessel.") (citing *Scindia*, 101 S.Ct. at 1626). Thus, the vessel owner is relieved of liability only if the condition arises in an area turned over to the stevedore for cargo operations.

■ As we noted earlier in this opinion, Turner was required to cross over the oil slick in order to obtain ship's gear to be used in securing the number 4 hatch. However, this does not mean that the oil

---

eliminated—indeed was permitted to continue to persist—until two hours after Turner's injury when a member of the ship's crew slipped and fell on the same oil. *See* Record Vol. II at 26–27, 103–04.

**5.** During direct examination of the stevedore's gang foreman, the following exchanges pertaining to the oil slick and the requests to the vessel owner occurred:

> Q: Did you or any of your members of your gang do anything to bring this to the attention of anybody on the ship?
> A: I went and got the First Mate and pointed this out to him. And asked him if he could do something about it, put some

sawdust over it or put boards over it or cover it over with something, remove it someway or other.

Record Vol. II at 18–19. Moreover, the record reveals that the vessel owner was repeatedly requested to clean up the oil spill.

> Q: Before Mr. Turner slipped and fell and injured himself would you tell the judge how many times you went and got their mate and brought him over there to have him clean up this oil slick or put something down?
> A: I made three trips to get the mate, to get him to clear this problem up.

Record Vol. II at 22.

covered area was within Turner's work area. In fact, as the district court found, the site was outside the work area of the number 4 hatch, in an area normally not traversed by longshoremen. This finding is fully supported by the record. During direct examination of gang foreman Goatcher, the following exchange occurred:

Q: You have been a longshoreman how long, 27 years?

A: 26 years.

Q: Excuse me. In your 26 years as being a longshoreman, when you go aboard a boat and you are going to use the ship's gear, where is this gear under normal and routine practice, where is this gear located?

A: Normally, it's near the hatch where we are working.

Record Vol. II at 16. Goatcher then explained how the ship's gear on the M/V CORTINA was not in the normal place—by the hatch—but was scattered all over the vessel. *See* Record Vol. II at 20–23. Clearly, Turner was required to venture outside the area of normal and routine cargo operations to areas within the ship's control and was forced to cross the oil slick in a location outside of his work area. This

theory was argued to the able and experienced district judge by Turner's counsel, *see* Record Vol. II at 5, and after hearing the evidence and observing the witnesses, the district judge made a clearly supported finding of fact that the slick area was not in the stevedore's work area.

■ Thus, the site in which the slick area was found—and in which Turner fell—was not an area turned over to the stevedore for cargo operations.[6] Under *Scindia* and *Helaire*, the vessel owner remains liable for such injuries, and the district court's judgment that the vessel owner remained liable is consistent with this Court's precedent.[7]

The dissent's argument is contradicted by the language it itself quotes from this Court's opinion in *Helaire:* "[T]he owner has no general duty by way of supervision or inspection to discover dangerous conditions that develop in the area *assigned* to the stevedore." 709 F.2d at 1036 (emphasis added). One can hardly say that the entire ship—except remote "enclaves"—was assigned to the stevedore; the district court's finding that the slick area was not in the gang's work area demonstrates that

---

**6.** The dissent notes, "The record indicates that *five* hatches—Nos. 1, 2, 3, 4 and 5—were being worked by the stevedore, thus is it patent that the finding of the trial court regarding the No. 4 hold will not stretch to cover the entire area turned over to the stevedore." Dissent's op. at 513 (emphasis original). An examination of the ship's diagram, however, indicates that the oily area lay behind the number 4 hold on the other side from the number 3 hatch. The slick area could not be said to be within the number 3 gang's work area. Likewise, the slick area was separated from the number 5 hatch by the major part of the ship's superstructure and therefore cannot be said to be within that gang's work area. That the slick area was somehow in the work area of the stevedore generally—when it was held to be not in the work area of the number 4 work gang specifically—seems a logical impossibility. The district court has already found explicitly that the oily area was not in the number 4 gang's work area. Further, that gang was the closest of all the work gangs to the oily area. To remand this case to the district court to determine whether the oily area was in the stevedore's work area would be a needless exercise.

**7.** The dissent argues that the district court's finding that the slick area was not in the stevedore gang's work area "is not dispositive." *Infra* at 512. Rather, the dissent argues the significant issue is "whether it was in the area over which the shipowner had relinquished control to Turner's employer, the stevedore, rather than in some enclave of the vessel over which the shipowner had reserved control while otherwise turning the vessel to the stevedore." *Id.* at 512. Thus, the dissent would interpret the stevedore's work area to include *any* area over which the stevedore's employees are required to traverse. This is clearly too broad a rule, since a longshoreman might be required to traverse numerous areas (walkways, ladders, planks, etc.) to get to the assigned work area—in this case the number 4 hatch—and these areas cannot be said to be within the stevedore's work area. Moreover, situations could arise in which a longshoreman, in the course of his/her duties, is required to venture into areas normally not entered by the longshoreman to carry out his/her duties. Indeed, such is the case here.

the slick area was not in the stevedore's assigned area.

### B. Vessel Owner's Liability for Ship Areas Within the Stevedore's Control

■ Even assuming that the slick area could be said to be within the stevedore's assigned area, the district court's fact findings clearly support its judgment under existing precedent.

In *Scindia,* the Supreme Court expressly held that a vessel owner could be held liable for injuries suffered by a stevedore's employee after commencement of unloading operations if the vessel owner had knowledge of the unreasonably dangerous condition and actual knowledge that the stevedore could not be relied upon to protect the employees from the danger. 451 U.S. at 175, 101 S.Ct. at 1626. Moreover, numerous decisions in this Circuit support a recovery under such facts. *See Wild v. Lykes Brothers Steamship Corp.,* 665 F.2d 519, 521 (5th Cir.1981) (quoting *Scindia,* 451 U.S. at 175, 101 S.Ct. at 1626); *Hill v.*

*Texaco, Inc.,* 674 F.2d 447, 451 (5th Cir. 1982) ("[T]he *Scindia* exception ... requires the vessel to protect a longshoreman or harborworker when the vessel knows of an unsafe condition and knows that the [stevedore] is not adequately guarding the longshoreman or harborworker against the danger...."); *Helaire v. Mobil Oil Co.,* 709 F.2d at 1038–39 (5th Cir.1983) ("Once loading operations have begun, the vessel owner can be held liable for injuries to employees of the stevedore ... only in the event of actual knowledge of the danger *and* actual knowledge that he cannot rely on the stevedore to remedy the situation.") (emphasis added);[8] and *Harris v. Flota Mercante Grancolombiana, S.A.,* 730 F.2d 296, 299 (discussing *Scindia,* the panel stated: "The Court reasoned that liability would fall on the shipowner only if he knew of the ... danger and also knew that the stevedore was not taking steps to cure it.")[9] Here, the vessel owner clearly knew that the dangerous condition existed and that (since the stevedore gang foreman re-

---

8. In *Helaire,* the panel recognized an exception to this rule if it was proved that it was "reasonable" for the vessel owner to rely on the stevedore's judgment that the condition, though dangerous, was safe enough. *See Helaire,* 709 F.2d at 1039, n. 12. But such is certainly not the case here, for the district court expressly held that the stevedore had repeatedly requested that the dangerous condition be removed. Surely the stevedore did not find the condition "safe enough" since it was the stevedore who urgently sought to have it removed virtually upon arrival and on at least two separate occasions. *See* Record Vol. II at 18–19, 22. *See also* note 5, *supra.*

9. In researching this issue, it becomes apparent that this Circuit has not spoken with a harmonious voice on the "obviously improvident judgment" language. Certain decisions of this Court have emphasized that the vessel owner must have actual knowledge of the unreasonably dangerous condition, actual knowledge that the stevedore cannot be relied upon to remedy the situation, *and* knowledge that the stevedore will—in the exercise of *obviously improvident judgment*—continue to work on in face of the dangerous condition. Indeed the "obviously improvident judgment" language appears in the majority opinion in *Scindia. Scindia,* 451 U.S. at 175, 101 S.Ct. at 1626. *See also Stass v. American Commercial Lines, Inc.,* 720 F.2d 879, 885 (5th Cir.1983) ("[T]he vessel knows of an unsafe condition that the stevedore ... is *im-*

*providently* failing to guard the worker against.") (emphasis added). However, other decisions of this Court have not employed the "obviously improvident judgment" language and—in what is submitted is language that better describes the vessel owner's duty—have instructed that liability exists when the vessel owner had actual knowledge of the unreasonably dangerous condition and actual knowledge that the stevedore could not be relied upon to remedy the situation. *See Harris,* 730 F.2d at 299; *Helaire,* 709 F.2d at 1039.

Under either test, however, the district court's judgment should be affirmed in the instant case. The evidence reveals (and the district court found) that the vessel owner twice was requested to remove the inherently dangerous oil slick, that the vessel owner replied that the condition would be remedied "in a moment"—thereby clearly indicating to the stevedore that the condition would be cleared up in a moment—yet failed to remove the condition until sometime after Turner's injuries when yet *another* individual slipped and fell on the same oil. *See* note 4, *supra.* It cannot be gainsaid but that the vessel owner knew of the dangerous condition, that the vessel owner knew the stevedore was not going to clean up the oil slick, and that the vessel owner knew that the stevedore was requiring its employees to work on in the face of the inherently dangerous condition.

peatedly requested that it be cleaned up and the vessel's mate agreed to do so) the stevedore could not be relied upon to protect the employees from the danger.

## III. Conclusion

As we have seen, the district court concluded as a factual matter that the vessel owner had actual knowledge of the unreasonably dangerous condition prior to Turner's injuries, but failed to remove the hazardous condition even though twice requested to do so. We have reviewed these fact findings and have concluded that they are not clearly erroneous. These fact findings clearly support the district court's judgment under existing precedent, and accordingly, we affirm the district court's judgment in all respects.

AFFIRMED.

GEE, Circuit Judge, dissenting:

As I do not agree that the fact findings of the district court support its judgment under today's precedents of our court, I respectfully dissent.

### The Law

About a month after the trial court made its findings quoted above and entered judgment for Turner based upon them, we had occasion in *Helaire v. Mobil Oil Co.*, 709 F.2d 1031 (5th Cir.1983), to review the law in this area. Discussing the Supreme Court decision in *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), we observed:

> While the opinion itself does not address every issue of vessel owner liability under § 905(b), several principles do emerge. The most basic of these is that the primary responsibility for the safety of the longshoremen rests upon the stevedore.... Once the stevedore's cargo operations have begun, absent contract provision, positive law, or custom to the contrary, the owner has no general duty by way of supervision or inspection to discover dangerous conditions that develop in the area assigned to the stevedore.

The Court explained that the owner is not liable to the longshoremen for injuries caused by dangers "about which he had no duty to inform himself," but rather "is entitled to rely on the stevedores, and owes no duty to the longshoremen to inspect or supervise the cargo operations." *Id.* 101 S.Ct. at 1624.

Despite these broad areas of immunity, however, there are circumstances where the owner cannot escape liability by reliance upon the stevedore. First, before turning over the ship to the stevedore, the owner has a duty to warn the longshoremen of hidden defects that would be known to the shipowner in the exercise of reasonable care. He must also exercise care to deliver to the stevedore a safe ship with respect to gear, equipment, tools, and work space. Second, the owner has a duty to avoid exposing the longshoremen to harm "from hazards under the act or control of the vessel." Third, even though the owner is generally relieved of responsibility for accidents which occur once the unloading process has begun, *"if [the stevedore's] judgment ... was so obviously improvident that [the owner], if it knew of the defect and that [the stevedore] was continuing to use it, should have realized the [defect] presented an unreasonable risk of harm to the longshoremen, ... in such circumstances [the owner] had a duty to intervene"* and eliminate or neutralize the hazard. *Id.* 101 S.Ct. at 1626. *Helaire*, 709 F.2d at 1036 (footnote omitted) (emphasis added).

Further on in our opinion, at 1038–39, we addressed the situation presented today:

> Although the circumstances in which this Court before *Scindia* indicated an owner might be held to a duty to anticipate harm which resulted from the stevedore's negligence are not frequent, they do exist. The critical fact for our analysis is that imposition of liability upon the vessel in the absence of actual knowledge is not *foreclosed* under the Restatement standard and under our earlier holdings. But it clearly is foreclosed un-

der *Scindia.* We must conclude, therefore, that *Scindia* did alter the law in this Circuit with respect to the specific negligence issue now under consideration. Once loading operations have begun, the vessel owner can be held liable for injuries to employees of the stevedore resulting from open and obvious dangers only in the event of actual knowledge of the danger *and* actual knowledge that he cannot rely on the stevedore to remedy the situation.[12]

[12] The opinion in *Scindia* recognized that the owner's actual knowledge of a dangerous condition which later injured a longshoreman would not in itself make him negligent. It might well be "reasonable" for the owner to rely on the stevedore's judgment that the condition, though dangerous, was safe enough. 101 S.Ct. at 1626.

*Helaire,* 709 F.2d at 1038–39 (emphasis original).

More recently, in *Stass v. American Commercial Lines, Inc.,* 720 F.2d 879, 884 (5th Cir.1983), we spoke directly to the precise hazard at issue today:

ACL [the shipowner] had no duty to supervise or inspect Louisiana Dock's repair operations, absent as here contrary contract, law, or custom. It could rely on Louisiana Dock to avoid exposing its employees, like Stass, to unreasonable hazards. Louisiana Dock, not ACL, was obliged to erect protective "guards" around open hatches, *remedy slippery footing,* and require proper procedures to be followed in opening grain doors.

(emphasis added) (footnotes omitted).[1]

### The Law Applied

From the above it is immediately apparent that the trial court's findings do not suffice to support its judgment under the

1. Rather than remedying the "slippery footing" here by simply throwing sawdust on the oil, as was its primary obligation, the stevedore contented itself with calling on the ship to do what was the stevedore's duty.

2. Turner attempts to argue that the shipowner owed him a duty to clean up after his employer during the wee-hours interval when stevedoring operations ceased at midnight and before they resumed at 7:00 on the morning of his injury,

law of our circuit as it exists today. That law is that once unloading operations have begun, the stevedore has the chief and primary responsibility for the safety of his employees within the area of the ship that is *under his control,* that the shipowner has no duty to monitor the stevedore's operations or inform himself regarding them, and that—with three narrow and specific exceptions—the shipowner is not responsible for injuries sustained in these circumstances. The exceptions are:

1. for failure to warn on turning over the ship of hidden defects of which he should have known,

2. for injury caused by hazards under the control of the ship, and

3. for failure to intervene in the stevedore's operations when he has actual knowledge both of the hazard and that the stevedore, in the exercise of "obviously improvident" judgment, means to work on in the face of it and therefore cannot be relied on to remedy it.

Turning to the facts of today's case, it is clear that although the latter two exceptions have possible application, the first does not: Turner testified that the presence of the oil was apparent at a glance.[2]

The second exception may apply if the oil spot was located in an area over which the shipowner retained control despite the stevedore's general control of the ship as a result of the owners "turning over the ship to the stevedore...." *Helaire,* 709 F.2d at 1036. To be sure, the trial court did find that the oil was "not in the work area of the securing gang for the no. 4 hold." Under *Helaire,* however, this finding is not dispositive. Instead, what signifies for this purpose is not whether the oil was in the

suggesting that unless stevedoring proceeds continuously and without any interruption, a new "turn-over" of the ship occurs every time it recommences. I reject this contention, nor does the majority espouse it. In the usual case, when stevedoring operations have commenced and are proceeding with only the customary breaks for sleeping hours and the like, it is reasonable to view the stevedore's control over areas turned over to him as continuous.

work area of Mr. Turner's gang, *but whether it was in the area over which the shipowner had relinquished control to Turner's employer, the stevedore, rather than in some enclave of the vessel over which the shipowner had reserved control while otherwise turning the vessel over to the stevedore.* If so, it was the primary obligation of the stevedore to remedy the hazard.

The majority achieves its result by extending the trial court's fact-finding quoted above that the oil was "not in the work area of the securing gang *for the No. 4 hold*" into one that it "was not in the stevedore's work area" or in "an area turned over to the stevedore for cargo operations." (Majority op. p. 509, all emphasis in quoted matter added). The record indicates that *five* hatches—Nos. 1, 2, 3, 4 and 5—were being worked by the stevedore, thus it is patent that the finding of the trial court regarding the No. 4 hold will not stretch to cover the entire area turned over to the stevedore. In my view, therefore, we should remand to the trial court to permit it to make an adequate finding under the law as it exists today.

There remains the final exception. If this is to apply, the court must determine that the shipowner should, in the twelve minutes between first complaint and injury, have deduced from the complaints of Goatcher about the presence of the oil, or in some other manner, that the stevedore could not be relied on to remedy the hazard but would, in the exercise of "obviously improvident" judgment, work on in the face of it so that the shipowner was required to intervene in the stevedore's operations. The trial court found as to this exception only that the ship's crew did not warn Turner or his colleagues about the presence of the oil and that Goatcher, the foreman, twice asked the crew to clean it up. The first finding is not of any significance, since it is undisputed that Turner and Goatcher knew of the condition and therefore required no warning. The sec-

ond is something to the purpose. It clearly falls short of a determination, however, that the stevedore could not be relied on either to wait "a moment" or to throw some sawdust on the spot, but would—in the Supreme Court's phrase, not our's—in the exercise of "obviously improvident" judgment, work on in the face of the hazard rather than stop work or take the measures, trivial in this case, required to remedy it.[3]

Our precedents following *Scindia* seem to me plainly to establish a simple and workable rule: that once the shipowner turns the vessel over to the stevedore for loading or unloading operations, primary responsibility for the safety of the stevedore's employees rests with him, subject only to the narrow exceptions that I have noted. The trial court's findings do not address any of these exceptions, as scarcely they could have: *Helaire*, in which they took definitive form, came down after the findings were made. Nevertheless, the majority affirms, ignoring the circumstance that the factual determinations of the trial court do not mesh with current precedent. I cannot join in so Procrustean an approach.

I would vacate the judgment of the trial court and remand the cause for further proceedings at which the trial court could address the correct issues in the case in light of our current precedent. Since the majority does otherwise, I respectfully dissent.

---

**3.** *Scindia,* 451 U.S. at 175, 101 S.Ct. at 1626 ("obviously improvident").