Arthur WOODWARD, Plaintiff

v.

LOGISTEC LTD., et al., Defendants

No. 3:00CV7473.

United States District Court,
N.D. Ohio,
Western Division.

Aug. 28, 2001.

Jay Harris, Lackey Nusbaum Harris Reny & Torzewski, Toledo, OH, for Plaintiffs.

Henry E. Billingsley, II, Arter & Hadden, Jeffrey A. Healy, Arter & Hadden, Thomas W. Baker, Arter & Hadden, Robert T. Coniam, Ray, Robinson, Carle & Davies, Thomas M. Wynne, Ray, Robinson, Carle & Davies, David G. Davies, Ray, Robinson, Carle & Davies, Cleveland, OH, Garrick O. White, Anspach, Serraino, Meeks & Nunn, Richard F. Ellenberger, Anspach, Serraino, Meeks & Nunn, William G. Kroncke, Kroncke, D'Arcangelo, Sutter & Fure, Toledo, OH, for Defendants.

## ORDER

CARR, District Judge.

This is a maritime case arising from an August, 1997, injury to the plaintiff caused when aluminum ingots stacked in the forward portion of Hold No. 3 of the M/V Melissa Desgagnes fell as the vessel's cargo was being unloaded at Toledo, Ohio. As a result of the accident, the plaintiff's right leg was amputated and he suffered other injuries. He has not returned to work.

Pending are motions by the loading stevedoring company, Logistec, Ltd. (Logistec) and the vessel's owner, Transport Desgagnes, Inc. (Desgagnes), for summary

judgment. For the reasons that follow, the motions shall be granted.

## Factual Background

The Melissa Desgagnes is a bulk cargo carrier 355 feet long, with a beam width of forty-eight feet, three inches, with four cargo holds and two shipboard cranes for loading and unloading. Prior to the accident, she had transported cast aluminum to Toledo from Sept–Isles, Quebec, on approximately eight occasions without incident.

On July 23, 1997, Logistecs began the loading for the trip that culminated in plaintiff's injury. The aluminum to be loaded consisted of "sows" and bundles. Each sow was a single solid casting, roughly pillow-shaped, weighing about 1,400 pounds. Each bundle was made up of forty-four ingots (each ingot looking roughly like the concrete forms used in parking lots as bumpers), with the bundle weighing about 2,200 pounds. The ingots in the bundles were nested and stacked and strapped together. Longitudinal channels in the bottom of the bundles fit the forks of a forklift to allow ease of handling during loading and unloading.

The length and width of the hatch over each hold are smaller than the length and width of the hold itself. Thus, a portion of the cargo cannot be stowed directly by the cranes loading the cargo into the hold. During the initial phase of loading, forklifts move and stow cargo in the fore, aft, and shipside portions of the hold that are under the deck.

If the "tanktop" (the bottom deck) of the hold is uneven, dunnage is placed where necessary to make the deck even. Unevenness occurs most frequently in the area of the tanktop beneath the cargo hatch where cargo initially is deposited during loading. According to the affidavit of Terry Spriggs, a vessel superintendent for Logistec, the tanktop of the Melissa Desgagnes was not uneven in the foresection of hold.

According to Sprigg's affidavit, dunnage—in this instance, hardwood boards one inch thick, six inches wide, and several feet long—would also be placed in the foresection of the hold to secure the load from tipping when the stem (as normally is the case, due to the location aft of the vessel of her house, bridge, and engine room) is lower in the water than the bow.

Loading of Hold No. 3 started with stowing of sows under the main deck overhang closest to the hold's aft bulkhead. Stowage occurred in tiers running the width of the hold from port to starboard. Forward of the stowed sows, but still under the aft segment of the main deck overhang, forklifts next stowed ingot bundles, working inward from the ship's sides toward the middle. A total of four tiers of ingot bundles was stowed, one tier at a time, across the vessel's width.

While the aft area under the overhang was being loaded with ingot bundles, the area under the overhang in the fore portion of the hold was being loaded. As in the aft area, the bundles were placed across the width of the ship, working from the ship's sides toward the middle, one tier at a time, until four tiers were loaded. As noted, dunnage was place to cant the ingots in the forward section toward the fore bulkhead to ensure lateral stability. Because the overhang over the forward portion of the hold was smaller than the portion under the overhang in the aft area, only four rows of bundles were loaded in the forward area beneath the overhang.

Next the "wings"—the starboard and port areas of the hold under the overhang—were loaded. Dunnage was placed as needed, and four tiers of bundles were placed laterally along the ship's sides.

Once the entire area under the overhang was stowed with cargo, the cranes lowered "drafts" of bundles, plus some sows, into the area beneath the open hatchway. This "drop stow," acting like a keystone in an arch, secured the stowed cargo.

The manner and sequence of stowage were customary to prior loadings of the Melissa Desganges and other vessels loaded by Logistec. Stowage of ingot bundles had gone as high as eight tiers, depending on the size of the vessel, though four tiers was standard with the Melissa Desganges.

The vessel departed Sept–Isles on July 25, 1997. After an uneventful passage, she docked at Toledo on July 30, 1997. Stevedores and longshoremen from Toledo World Industries began unloading the aluminum on July 31, 1997. Unloading continued on Friday, August 1, 1997, but was interrupted for the weekend. On Monday, August 4, 1997, the date of the accident, unloading resumed.

Although there is always some danger when discharging cargo, the risk of accident and injury can be minimized by unloading the cargo in reverse order—i.e., by first removing the drop stow, and then removing the remaining cargo tier by tier. In addition, when moving the bundles, the forklift operator should insert the forks into the channels left for that purpose in the bundles when the ingots are strapped together.

This procedure was not used to unload the Melissa Desganges. Nor had it been used when the vessel had delivered aluminum to Toledo in the past. Instead, stacked bundles were removed from the top down, instead of being removed horizontally tier by tier. In addition, the forks were not inserted into the longitudinal channels, but were slid under the sides of the bundles.

The vessel's crew had on prior occasions expressed concerns during offloading in Toledo about the dangers of unloading stack by stack, rather than tier by tier. During the unloading leading to this case, the Toledo stevedores used the same method that they had used during prior unloadings of the Melissa Desganges.

Plaintiff was injured when the top bundles of one of two stacks remaining in the starboard fore portion of the hold fell on his leg. In his deposition, he acknowledged that he was aware that he could, and should have been standing clear of the area before the bundles fell, and that he was not required to be where he was in order to do his job.

Shortly before the bundles fell, the vessel's Third Mate, Anne–Marie Asselin, noting a list of an inch or two, was about to have ballast water taken on to trim the vessel. Before ballasting began, Asselin noticed a commotion around No. 3 hatch, and learned that the accident had occurred.

Plaintiff claims that Logistec breached duties owed to him by loading the cargo in an unsafe manner. According to an affidavit by Harold Chevalier, marine foreman for Toledo World who began working as a longshoreman in 1960, the tanktop was uneven, with pothole like depressions between floor support beams. Chevalier also asserts that the dunnage was not solid, sturdy, or adequate to support the four tiers of ingot bundles under normal unloading procedures. As a result, he states, the bundles fell onto the plaintiff. Chevalier also asserts that Logistec should have limited the height of the bundle stacks to three, rather than four tiers and used sows around the perimeter of the hold to further secure the stacks during unloading.

Plaintiff claims that Desganges negligently failed to avoid a known risk of injury to stevedores off-loading aluminum at Toledo. In light of the crew's prior expressions of concern about the methods used to unload earlier shipments, plaintiff

contends that the vessel's owner knew that its suggestions to use safer methods would again be disregarded. In light of such knowledge, Desganges should, plaintiff asserts, have loaded only three, rather than four tier high stacks of ingot bundles. Plaintiff also notes that the Melissa Desganges is relatively light and small, causing it to roll while the ship's crane is in use during unloading.

## Discussion

### 1. Logistec

■ Plaintiff first claims that Logistec used dunnage that was not solid, sturdy, or adequate, and that it failed to use dunnage to make plane the uneven areas in the tanktop. Plaintiff has failed to provide adequate evidentiary support for his conclusory assertion about the inadequacy of the dunnage and its use.

In support of his claim about the inadequacy of the dunnage, plaintiff points to statements in following paragraphs from the Chevalier affidavit:

6. The No. 3 cargo hold of the Melissa Desgagnes has a very uneven floor with concave areas between the floor support beams or "strong backs". The sunken areas of the cargo hold floor were 3–4" deep. The sunken areas were like potholes between the floor supports.

7. The uneven No. 3 cargo hold floor would not safely support bundled aluminum ingots without solid, sturdy and adequate dunnage to fill in the sunken potholes as well as to provide support between each layer of bundled aluminum ingots.

\*　　\*　　\*　　\*　　\*　　\*

10. The dunnage that was suppled by the loading stevedore was not solid, sturdy and adequate to support the four high layers of aluminum ingot bundles under the normal unloading procedures and allowed the four high stack or column of bundled ingots to fall over and injure [the plaintiff].

11. If the dunnage had been solid, sturdy and adequate, [plaintiff] would not have been injured.

12. After [plaintiff] was injured, the next shipment of bundled aluminum ingots in the M/V Desgagnes used much better quality and a much greater quantity of dunnage both to fill in the potholes in the floor as well as the voids between the layers.

13. No stacks of bundles aluminum ingots have fallen over since the loading stevedore began using more and better quality dunnage even though the stacks are still stowed at an unsafe four layers high.

(Doc. 68, Exh. A).

In its reply, Logistec submits the Sprigg's affidavit, which states that he "was personally involved in the review of the stow plan for the loading of this hold and I personally was on duty during loading operations." (Doc. 73, Exh. ¶ 7). The Spriggs' affidavit also states, with regard to the condition of the tanktop and condition of the dunnage:

8. The M/V MELISSA DESGAGNES was inspected and approved for loading by Logitec at Sept–Isles. There was no condition on the tanktop that constituted a hazard to loading operations. Vessels that carry heavy, metal products will usually have some uneven surfaces on the tanktop, particularly beneath the hatch square where the cargo is landed on the tanktop. This is normal in the industry. This was not a safety concern in the loading of the M/V MELISSA DESGAGNES in July of 1997. If it had been, Logistec would have refused to load the ship or required that steel plates be placed on the tanktop to smooth out the surface. Further, *there was no uneven surface*

*in the area along the forward bulkhead of Number 3 Hold, beneath the main deck overhang.* The tanktop is, in this respect, like the wall-to-wall carpet in a well-used room. The wear is at the location that receives the heaviest traffic—not on the edges along the bulkheads and shipsides. [Emphasis supplied].

\* \* \* \* \* \*

10.... Dunnage, consisting of rough-cut, hardwood lumber, nominally one inch thick by six inches wide was placed between the tiers of bundles as needed to ... cant the after end of the hold toward the after bulkhead. The dunnage pieces range in length from eight to fourteen feet.

11....[In the forward end of the hold] the objective was to cant or tilt the bundles ... toward the *forward* bulkhead. Because the vessel is typically on an aft trim dunnage was placed on the tanktop to cant the bottom tier of the forward end stow against the *forward* bulkhead.... More dunnage was used, as needed, on the upper tiers. These long courses of dunnage tend to tie the bundles together, while reducing the chance that a bundle can fall aft, out of stow.

\* \* \* \* \* \*

14. Number 3 Hold of the M/V MELISSA DESGAGNES was loaded in July of 1997 in the same manner as it and many other ship holds have been loaded by Logistec. The same type of hardwood dunnage was used. It was employed in the same manner as it had been employed on this ship and others.

As vessel superintendent on this loading of the M/V MELISSA DESGAGNES I never received any word of complaint about the loading of the ship, the quality or quantity of dunnage used, the height of the stow, or the condition of the hold. (*Id.*).

In light of the specificity in this affidavit, the conclusory statements by Chevalier about the unevenness of the tanktop and quality and placement of dunnage are insufficient to raise a genuine issue of material fact about the condition of the hold and dunnage. Chevalier refers generally to the tanktop and spaces between the braces—he does not, however, say anything about the deck's condition in the location of the collapsed stack. Nor does he assert that no dunnage was used to abate unevenness there or elsewhere.[1]

The principal thrust of the Chevalier affidavit relates to the allegedly poor quality of the dunnage. But his allegations are entirely conclusory, especially in light of his forty years' experience on the Toledo docks and observation of the unloading of "approximately 2500—3000 merchant cargo ships since I began working as a longshoreman...." (Doc. 68, Exh. A, ¶ 3). He points to no specific fault with the dunnage, and fails to describe anything about its alleged inadequacy—i.e., whether the wood was the wrong kind, improperly sized or placed, rotten, termite infested, or otherwise defective in a particular way. Greater specificity about the alleged inadequacy is required to create a genuine issue of material fact about the condition and placement of the dunnage in response to Spriggs' detailed and unequivocal state-

---

1. Were the deck uneven, the duty, in my view, to correct the situation lay in the first instance with Logistec, not Desgagnes. On observing a potentially dangerous condition of the tanktop, Logistec could either refuse to proceed, if it concluded that dunnage would not ensure the safety of its workmen or others, or it could use dunnage to make the cargo stable. Even if there were evidence, rather than simple conclusory assertions, that the condition of the deck was as plaintiff contends, and that the condition proximately caused the stack to fall, the loading stevedore, rather than the vessel owner, should be liable.

ments about the kind, size, condition, and use of the dunnage. Saying, in effect, that the dunnage was no good is not enough to create an issue of fact for the jury.

█ Chevalier also states that subsequent shipments have used more dunnage of better quality, and that no further incidents have occurred during offloading of aluminum from the M/V Melissa Desgagnes. (*Id.* ¶¶ 12, 13). Even assuming that this statement would be admissible under Fed.R.Evid. 407 (which it is not), it does not suffice to overcome the insufficiency of the allegations about the condition and use of the dunnage with the July, 1997, shipment.

Plaintiff asserts that Logistec failed to respond to interrogatories about its written requirements for dunnage and specifics of the dunnage used in the July, 1997, shipment. In light of such alleged failure, plaintiff claims that the answers, had they been forthcoming, would have been adverse to Logistec.

As noted by Logistec, the interrogatories to which plaintiff refers received a response, albeit informal, in letters sent by Logistec's counsel to plaintiff's counsel. In addition, the information sought therein, to the extent it may have been available, appears to have been addressed during Spriggs' deposition. Thus, even if failure to answer interrogatories could result in the presumption proposed by plaintiff—an issue as to which I express no opinion—the information sought appears to have been made generally available to the plaintiff.[2]

Because plaintiff has presented only conclusory assertions without a factual ba-

sis, there is no genuine dispute about the condition of the hold underneath the stack that collapsed or the quality and placement of the dunnage used in this shipment. Defendant Logistec cannot, accordingly, be found liable for the plaintiff's injuries, and its motion for summary judgment shall be granted.

### 2. Desgagnes

Plaintiff asserts that Desgagnes' charter agreement with the charterer, C. Steinweg Handelsveem B.V., imposed duties on the vessel's owner, and make it liable for his injuries. In addition, plaintiff contends that statutory provisions relieving Desgagnes of strict liability nonetheless impose duties on it that it breached, likewise making it liable to him. Neither of these contentions is persuasive or overcome's Desgagnes' motion for summary judgment.

### a. The Charter Agreement

█ A provision of the Charter Agreement states:

> Stevedores, although appointed and paid for by the Charterers/Shippers/Receivers are considered to be the servants to the vessel, and are to work under the direction of the Master who will be responsible for proper stowage and the seaworthy trim of the vessel.

Doc. 68, Exh. B Attachment ¶ 23.

Plaintiff contends that this provision makes the Desganges liable for any injuries resulting from improper stowage of the ingots. Without deciding whether, as plaintiff suggests, a charter agreement to which the stevedores are not parties can impose duties vis-a-vis an injured longshoreman on a shipowner, I find plaintiff's

---

**2.** I note, as well, that, to the extent that plaintiff's counsel did not get a suitable response to his interrogatories, he nonetheless made no complaint about its insufficiency to me. More importantly, he did not request my assistance to resolve any dispute on this issue, as required by Rule 37.1 of our local rules, or

file a motion under Fed.R.Civ.P. 37 for sanctions. If sanctions had been sought and found warranted, Logistec could, inter alia, have been precluded from offering evidence about the quality of dunnage. Fed.R.Civ.P. 37(b)(2)(B).

argument to be without merit. Its premise—that the cargo was improperly stowed—is, as noted in granting Logistec's summary judgment motion, without foundation.

**b. Breach of Duties Owed to Plaintiff**

■ Historically, a ship's owner would be strictly liable if the unseaworthiness of a vessel caused injury to a longshoreman. In 1972, however, Congress amended the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b) to exclude unseaworthiness as a basis for liability against a shipowner. The amended statute provides, "The liability of the vessel ... shall not be based upon the warranty of seaworthiness or a breach thereof ...." The purpose of the amendment was to reduce the liability of shipowners for injuries to longshoremen. H.R. 92–1441, 92 Cong., 2d Sess. (1972), 1972 U.S. Cong. & Ad. News, pp. 4793–94.

■ As a general rule, therefore, the stevedore, as the longshoreman's employer, is primarily charged with ensuring its employees' workplace safety. The negligence of others cannot be imputed automatically to the vessel's owner. In the 1972 amendment, as the Supreme Court stated in *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 168, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), Congress intended to relieve a vessel's owner of exposure to liability based on "conditions caused by the negligence or other defaults of the stevedore, ....."

■ This allocation of liability reflects the stevedore's "primary control over the details of a cargo operation." *Howlett v. Birkdale Shipping Co.*, 512 U.S. 92, 103, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994). Even where the stevedore encounters improperly stowed cargo, shipowners "are entitled to assume that a competent stevedore will be able to identify and cope with defects in the stow." *Id.* at 104, 114 S.Ct. 2057.

■ In *Scindia* the Court set forth three duties, commonly referred to as "*Scindia* duties," owed by a vessel's owner to longshoremen. These duties are referred to as: 1) the turnover duty; 2) the active control duty; and 3) the duty to intervene. In light of the intent of the 1972 amendment to limit a vessel owner's liability, the duties are narrow. *Howlett*, 512 U.S. at 105, 114 S.Ct. 2057.

**1. The Turnover Duty**

■ The first *Scindia* duty is the "turnover duty." This duty requires the shipowner to exercise

> ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property, and to warning the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work. The shipowner thus has a duty with respect to the condition of the ship's gear, equipment, tools, and work space to be used in the stevedoring operations; and if he fails at least to warn the stevedore of hidden danger which would have been known to him in the exercise of reasonable care, he has breached his duty and is liable if his negligence causes injury to a longshoreman.

451 U.S. at 165–66, 101 S.Ct. 1614 (citation omitted).

To satisfy its obligations under the turnover duty, the shipowner must

> "exercise ordinary care under the circumstances" to turn over the ship and its equipment and appliances "in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care" to carry on cargo operations "with reasonable safety to persons and property."

*Federal Marine Terminals, Inc. v. Burnside Shipping Co.*, 394 U.S. 404, 416–17, 89 S.Ct. 1144, 22 L.Ed.2d 371 (1969) (citations omitted).

The Supreme Court noted in *Howlett* that the turnover duty includes a duty to warn a longshoreman about dangers about which it has or reasonably could have notice, and where the longshoreman is not, and reasonably could not, be aware of the risk:

> A corollary to the turnover duty requires the vessel to warn the stevedore "of any hazards on the ship or with respect to its equipment," so long as the hazards "are known to the vessel or should be known to it in the exercise of reasonable care," and "would likely be encountered by the stevedore in the course of his cargo operations[,] are not known by the stevedore[,] and would not be obvious to or anticipated by him if reasonably competent in the performance of his work."

512 U.S. at 98–99, 114 S.Ct. 2057 (citations omitted).

With regard to latent hazards, the turnover duty to warn, the Court also stated in *Howlett*, "may extend to certain latent hazards in the cargo stow ... because an improper stow can cause injuries to longshoremen, and thus is among the 'hazards on the ship' to which the duty to warn attaches." *Id.* (citations omitted). *Id.* A latent hazard in this context means, the Court explained, only "hazards that would be neither obvious to nor anticipated by a competent stevedore in the ordinary course of cargo operations." *Id.* In any event, the Court emphasized, "the vessel's duty to warn is confined to latent hazards that 'are known to the vessel or should be known to it in the exercise of reasonable care.'" *Id.* at 99–100, 114 S.Ct. 2057 (citations omitted).

■ In this case, the alleged defect with regard to the turnover duty is improper stowage ab initio. Plaintiff does not contend that Desgagnes operated the vessel in such a manner to heighten the risk of injury to stevedores. Instead, plaintiff contends that the shipowner should have limited the height of the stacked bundles to three, rather than four tiers.

I have already found no genuine issue of material fact with regard to the stowage of the cargo by Logistec. Desgagnes did nothing to create a risk of injury between the time of loading at Sept–Isles and turning the vessel over to Toledo World for unloading. There is no contention that the cargo had shifted, or something else had occurred to endanger the longshoremen as they were about to begin unloading. Plaintiff, moreover, does not contend that there was any latent or hidden defect known, or which reasonably could have been known to the vessel owner. Thus, there was no duty to warn.

In any event, the stevedore knew as much about the stowage as the shipowner. Before commencing unloading, it examined the cargo, and concluded that unloading could proceed. It saw, apparently, exactly what had been seen during a similar inspection of the stowage conducted before the Melissa Desgagnes left Sept–Isles—bulk cargo stowed in a conventional and apparently safe manner.

On the issue of its turnover duty, Desgagnes is entitled to summary judgment.

### 2. The Active Control Duty

 In *Scindia* the Court stated: "the vessel may be liable if it actively involves itself in the cargo operations and negligently injures a longshoreman or if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." 451 U.S. at 167, 101 S.Ct. 1614. Mere observation of unloading or a warning to the stevedores about some risk is not sufficient to place the shipowner in active control of the unloading operation. *See Quevedo v. Trans–Pacific Shipping, Inc.*, 143 F.3d 1255, 1260 (9th Cir.1998).

The only control exercised by the crew at any time during the unloading occurred, to be sure, shortly before the plaintiff was injured. Third Mate Asselin, noticing that the vessel was listing to port by an inch or two, yelled to the stevedores to take cargo from the other side to correct the list. When their doing so did not immediately correct the list, she decided to correct the vessel's trim with ballast. Before that operation had been completed, the stack fell, injuring the plaintiff.

 Plaintiff does not contend that the ballasting ordered by Ms. Asselin increased the risk of injury, even if it had been completed before the bundles fell, and he does not contend that her actions in any way proximately caused his resulting injury. Where a crew member begins to take a step that would have trimmed the ship, and thus decreased, rather than increased, the risk of injury, that crew member has not taken such active control over the unloading as to make her employer liable.

The shipowner did not assume active control over the unloading, cannot be held liable for having done so, and is entitled to summary judgment on this issue.

### 3. Duty to Intervene

In *Scindia* the Supreme Court posed the question, "What are the shipowner's duties when he learns that an apparently dangerous condition exists or has developed in the cargo operation, which is known to the stevedore and which may cause injury to the longshoreman? Must the owner take some action?" 451 U.S. at 172–73, 101 S.Ct. 1614. "Arguably," the Court stated, the shipowner should be "justified in expecting [the stevedore] to perform its undertaking and should therefore have no duty or responsibility with respect to [equipment], which, if defective, was obviously so and which the stevedore continued to use." *Id.* at 174, 101 S.Ct. 1614. The Court concluded, however, that "there are circumstances in which the shipowner has a duty to act where the danger to longshoremen arises from the malfunctioning of the ship's gear being used in the cargo operations." *Id.* at 175, 101 S.Ct. 1614.

 The duty to intervene, the Court also noted in *Howlett*, "concerns the vessel's obligations to intervene with regard to cargo operations in areas under the principal control of the independent stevedore." 512 U.S. at 98, 114 S.Ct. 2057. The duty, however, does not impose on the shipowner a continuing duty to inspect or supervise during the stevedoring operations. *Scindia*, 451 U.S. at 172, 101 S.Ct. 1614.

The Fifth Circuit, which has extensive experience with maritime accidents and cases, has, consistent with the intent underlying the 1972 amendment to § 905(b), interpreted the duty to intervene under *Scindia* restrictively:

> To impose a duty to intervene on the shipowner, respecting dangers not creat-

ed by it which are obvious to the stevedore's employees and arise during and in the area of the stevedore's operations, something more is required than the mere shipboard location of the dangerous situation and the shipowner's knowledge of it.

\*　　\*　　\*　　\*　　\*　　\*

Several considerations support our determination that, ..., to impose a duty to intervene on a shipowner, respecting dangers not created by it which are obvious to the stevedore's employees and arise during and in the area of the stevedore's operations, something more is required beyond the mere presence of the danger on board and the shipowner's knowledge of it. First, we believe this logically flows from the division of duty between the shipowner and the stevedore, or independent contractor, as described in *Scindia*. Once stevedoring or repair operations have begun, it is the stevedore, not the shipowner, who assumes the responsibility for the safety of its employees. The exception expressed by *Scindia* is a narrow one and, absent some relevant assumption of duty by the shipowner, does not, we believe, extend to an open and obvious transitory condition, ..., that is created entirely by the independent contractor, is under its control, and relates wholly to its own gear and operations.

*Futo v. Lykes Bros. S.S. Co., Inc.,* 742 F.2d 209, 215–16 (5th Cir.1984).

▮▮▮ The court explained the rationale for this approach in *Casaceli v. Martech International, Inc.,* 774 F.2d 1322, 1327 (5th Cir.1985): "A distinction between defects in the ship itself and its gear, and defects not directly related to the ship, is logical since the owner is primarily responsible for the ship, gains the most from its proper maintenance, and can usually best comprehend the danger from a defect in the ship, its gear or equipment." Thus,

where the dangerous condition is within an area under the owner's control, it will be held to a duty to intervene in response to the risk of injury. *See, e.g., Theriot v. Bay Drilling Corp.,* 783 F.2d 527, 535 (5th Cir. 1986) (owner "continued to control the work area, retaining the obligation to clean the keyway deck."); *Turner v. Costa Line Cargo Services, Inc.,* 744 F.2d 505, 508–09 (5th Cir.1984) (shipowner liable for injuries sustained by a longshoreman who slipped and fell on an oil slick in an area within the shipowner's control); *Helaire v. Mobil Oil Co.,* 709 F.2d 1031, 1036 (5th Cir.1983) ("the owner has a duty to avoid exposing longshoremen to harm 'from hazards under the act or control of the vessel.' "). But this was not the situation here, where both the area and operation were under the stevedore's exclusive control at the time of the stack's collapse.

▮▮▮ In *Futo,* 742 F.2d at 218, 221, and *Casaceli,* 774 F.2d at 1328, the Fifth Circuit has set forth a series of six factors to be considered in determining whether there is a duty to intervene: whether the danger was open and obvious; whether the danger was located within the ship or ship's gear; which party created the danger or used the defective item and was therefore in a better position to correct it; which party owned and controlled the defective item; whether an affirmative act of negligence or acquiescence in the use of the dangerous item occurred; and whether the shipowner assumed any duty with regard to the dangerous item.

Applying these factors to this case, it is clear that Desgagnes had no duty to intervene. Even if the danger were open and obvious, it was not within the ship or its gear, it was created by the stevedore's unsafe method of dismantling the stacks, which were under its complete control (or, "ownership"), there was no affirmative act of negligence on the shipowner's part, and

it had assumed no duty with regard to the dangerous condition.

The same result was reached in *Singleton v. Guangzhou Ocean Shipping Co.*, 79 F.3d 26, (5th Cir.1996), a case factually similar to the instant case. In that case a longshoreman was injured when a pile of ingots which he was unloading collapsed as a result of his use of an unsafe method for moving the ingots. Because the collapse was caused by a defective unloading procedure, rather than as a result of some danger inherent in the vessel or its gear, the court reversed a verdict for the plaintiff. *See also Williams v. M/V SONORA*, 985 F.2d 808, 812 (5th Cir.1993) (shipowner had no duty to intervene unless some element of shipowner control over the dangerous procedure or some involvement of a "defective" ship appurtenance was present); *Hunter v. Intreprinderea de Explore Flott Maritime Navrom,* 868 F.2d 1386, 1388 (5th Cir.1989) (shipowner not liable for failure to perform duty to intervene where trial court found that "the dangerous condition had nothing to do with the vessel's gear; that the vessel did not own the defective item; that there was no allegation of an affirmative act of negligence by the vessel; and that the shipowner had not assumed any duty with regard to the dangerous condition.").

The unrefuted evidence in this case is that removal of the ingots stack by stack from the top down, rather than tier by tier horizontally, led to the collapse. There can be no rational doubt that, had removal occurred tier by tier, rather than stack by stack, the accident would not have happened. Without something more to connect the shipowner to the dangerous condition other than its knowledge that the way in which the stevedore was doing its job was unsafe, the shipowner cannot be held liable under *Scindia.*

### Conclusion

For the foregoing reasons, it is hereby ORDERED THAT the motions of the defendants for summary judgment be, and the same hereby are granted.

So ordered.