IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 95-40390

---

HORACE FONTENOT,

Plaintiff-Appellee,

THE TRAVELERS INSURANCE COMPANY,

Intervenor Plaintiff-Appellee

versus

UNITED STATES OF AMERICA,

Intervenor Defendant-Appellant.

---

Appeal from the United States District Court
for the  Eastern District of Texas

---

July 9, 1996

Before LAY[*], HIGGINBOTHAM, and STEWART, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

I

This is a tort suit against the United States as vessel owner brought by a welder employed by an independent contractor engaged in its repair.  The worker slipped on a hatch cover and was severely injured.  The district court found that the government breached its second and third Scindia duties and awarded substantial damages to the worker and the intervening workmen's

---

[*]Circuit Judge of the Eighth Circuit, sitting by designation.

compensation carrier.[2]  The trio of duties set forth in <u>Scindia</u>, now a litany, include: (1) a "turnover duty" looking to the condition of the vessel at the time the stevedore or repair company takes over; (2) a duty to exercise reasonable care to prevent injuries to longshoremen working in areas remaining under "the active control of the vessel" or when the vessel owner "actively involves itself in the cargo operations," <u>id.</u> at 167; and (3) a "duty to intervene" if the stevedore's judgment "is obviously improvident."  451 U.S. at 175.  The district court found that the government retained control over the vessel and had actual knowledge of the dangerous conditions on board.  Accepting the facts as found by the district court, we conclude that the government breached no duty owed Fontenot, an employee of an independent contractor engaged in the repair of the vessel.  We reverse and render.


II

The M/V DEL VIENTO is a public vessel of the United States. This breakbulk general cargo vessel was not operational when purchased by the United States and had never been operated by the government at the time of the accident.  On its purchase, the government contracted with Apex Marine to act as its general agent and ship manager.  Apex Marine in turn engaged Horace Fontenot's employer, Coastal Marine, to work on the vessel.  The United States

---

[2]<u>Scindia Steam Navigation Co. v. De los Santos</u>, 451 U.S. 156 (1981).

maintained no crew aboard the vessel while Coastal Marine did its work.  Coastal Marine supervised Fontenot's welding work.  Fontenot was not subject to direction by others.

One morning while walking on the vessel's hatch covers to his work area, Fontenot slipped and fell.  It had rained the day before, and the deck and hatch covers were wet.  The workers on the vessels used the hatch covers as walkways because the decks and passageways were cluttered with machinery and tools.  Although the workers had no other practical means of moving about on the deck, the hatch covers were not painted with nonskid paint, and they had no matting, handrails, or toeboards.  It is undisputed that these conditions were obvious to all workers, including Fontenot, and that the United States knew that the workers were using the hatch covers as walkways.

The pretrial order recited a number of "admitted facts," including a description of the accident itself.  The parties agreed that:

> (22)  When Mr. Fontenot reported to work aboard the M/V DEL VIENTO at 7:00 a.m. on November 18, his supervisor at Coastal Marine assigned him to continue welding rusted and holed pipes, just as he had been doing on Friday, November 15.
>
> (23)  When Mr. Fontenot boarded the M/V DEL VIENTO on November 18, 1991, he reported to a guard shack on the forward, port hatch cover, crossed a "scaffold board" to the forward, centerline hatch cover, and walked toward the after end of that hatch cover, where he was to begin welding for the day.  His assistant was with him, but stopped in a portable toilet on the forward, centerline hatch cover.
>
> (24)  As Mr. Fontenot approached the after end of the forward, centerline hatch cover, he slipped in oil and water on the hatch cover, lost his balance completely,

3

grabbed for a nearby cable but missed, and pitched head first off the after end of the hatch cover, causing his injuries.

(25)  The oil on the forward, centerline hatch cover in which Mr. Fontenot slipped was left there earlier by personnel who had disassembled valves there.

(26)  The water on the forward, centerline hatch cover in which Mr. Fontenot slipped was rainwater that had accumulated during the rainy night of November 17.

(27)  Mr. Fontenot's slip and fall occurred at dusk and there was no problem with lighting on the hatch cover.

(28)  Mr. Fontenot knew that he was not walking on nonskid paint as he crossed the forward, centerline hatch cover.

(29)  On November 18, 1991 at the time of Plaintiff's accident, the hatch cover upon which Plaintiff was walking was wet, and had hydraulic oil on it, left earlier the week before by other personnel.


III

The government denies that it breached any duty owed as the vessel's owner. It does not attack the findings of fact by the district court as clearly erroneous.  Rather, accepting the facts as found by the district court, the government argues that the ultimate findings cannot be sustained under <u>Scindia</u>.

A

First, the government urges that the district court erred in concluding that it was "in control of the vessel" at the time of the accident.  There were four government men at the site working from an office located on the shore.  The government argues that these men "did not supervise employees, direct the work, determine where equipment was to be stored, or tell workers how they were to get to and from their work stations."  In response, Fontenot points

4

to only three items of testimony relevant to the issue of control. Fontenot's son who also worked on the DEL VIENTO for the same employer, testified that on one occasion a "government man", in the presence of the foreman, asked him to straighten a crooked steel wheel. His son further testified that he might have once told a government agent — "I think it was a government man" — about the need for scaffolding. Finally, Fontenot points to the undisputed fact that the government agents told Coastal Marine to improve its housekeeping — to keep "paper goods, coffee cups, cigarette butts, that sort of thing out of engine spaces."

As for the straighten-the-wheel request, the government urges that this was little more than an inspection for conformity to specifications and was made in the presence of the Coastal foreman — not the type of control envisioned by Scindia. The testimony regarding a request for scaffolding, the government replies, was equivocal regarding the identity of the person to whom it was made, and there is no evidence of any response to the request that might signal control over the condition of the work site. Finally, the government urges that an owner's request that the workplace be kept more tidy is no more than "the reasonable action of an owner interested in protecting his property." In short, the government argues that accepting that these events occurred, they are not singly or in combination a retention of control under Scindia.

This dispute over the presence of control is not resolvable by accepting one version of fact over another version. Rather, the answer lies in the meaning of Scindia, an issue of law. We have

5

interpreted the second <u>Scindia</u> test in the <u>Futo</u>,[3] <u>Turner</u>,[4] and <u>Pimental</u>[5] cases. We made plain in <u>Futo</u> that a vessel owner will not trigger a duty by having its employees board the vessel daily "to ensure the security of the ship and to check on the progress of the contractor's work."[6] In <u>Turner</u> we found a vessel owner liable for a fall suffered when the worker was required to "venture outside of the area of normal and routine cargo operations to areas within the ship's control and was forced to cross the oil slick in a location outside of his work area."[7] In <u>Pimental</u> we found no liability existed under the second <u>Scindia</u> test because the fall occurred in an area turned over to the stevedore.

Here, the entire vessel had been turned over to the contractor over a month before the accident. It was Coastal Marine that put the gear in the passageways, forcing the workers to walk on the hatch covers. The vessel had no crew, so the oil spill and its attempted cleanup were all by Coastal workers. We are persuaded that the vessel owner here had no liability under the second <u>Scindia</u> duty.

---

[3]<u>Futo v. Lykes Bros. Steamship Co.</u>., 742 F.2d 20 (5th Cir. 1984).

[4]<u>Turner v. Costa Line Cargo Servs., Inc.</u>, 744 F.2d 505 (5th Cir. 1984).

[5]<u>Pimental v. LTD Canadian Pacific Bul</u>, 65 F.2d 13 (5th Cir. 1992).

[6]742 F.2d at 210.

[7]744 F. 2d at 509.

Scindia requires a vessel owner to intervene if the vessel owner has actual knowledge both of the hazard and that the contractor, in the exercise of "obviously improvident" judgment under "pertinent statutes, regulations, or custom," means to continue working in the face of it.[8] There are no such statutes or regulations and, as we will explain, there is no competent evidence of custom.

We have developed several implementing principles. In Singleton v. Guangzhou Ocean Shipping Co., 79 F.3d 26, 28 (5th Cir. 1996), we emphasized that the shipowner's duty to intervene under the third Scindia exception "is narrow and requires 'something more' than mere shipowner knowledge of a dangerous condition." We held in Futo that this duty to intervene "does not...extend to an open and obvious transitory condition" created by the contractor. We insisted that the vessel owner must "have actual knowledge that a dangerous condition exists and actual knowledge that the stevedore is not acting to protect the longshoreman."[9] In Casaceli[10] we announced a six factor test to guide the determination whether the vessel owner has a duty to intervene: (1) whether the danger was open and obvious, (2) whether the danger was located in the ship or ship's gear; (3) which party created the danger or used

---

[8]451 U.S. at 175-176.

[9]742 F.2d at 220.

[10]Casaceli v. Martech Int'l, Inc., 774 F.2d 1322 (5th Cir. 1985), cert. denied, 475 U.S. 1108 (1986); see also Williams v. M\V Sonora, 985 F.2d 808 (5th Cir. 1993)

the defective item and was therefore in a better position to correct it; (4) which party owned and controlled the defective item; (5) whether an affirmative act of negligence or acquiescence in the use of a dangerous item; and (6) whether the shipowner assumed any duty with regard to the dangerous item.[11]

As the government points out, the danger of oil on the wet hatch covers was open and obvious, and was not created by ship gear controlled by the vessel owner. Nor was there a defect in the vessel. Nonskid paint, toeboards, bridges, and handrails were not essential to the operation of the vessel. To the contrary, the crew of the vessel would not routinely walk on the hatchways. It was in the repair of the vessel that the usual passageways were blocked, sending the employees of the contractor over the hatchways. This operation was under the exclusive control of the contractor, Fontenot's employer.

Finally, we find no value in the testimony of several expert witnesses. The government's expert testified that marine custom placed all responsibility for safety during repair of a vessel on the repair contractor. The plaintiff offered the "expert" opinion of a tugboat operator that the responsibility lay with the vessel owner. The testimony of neither "expert" witness was competent. An expert could be helpful in dealing with specific equipment or in detailing a repair or stevedoring functions and the custom attending those functions. Custom is relevant to the legal standards, as Scindia explained, but custom itself is not law. At

_____

[11]774 F.2d at 1328 (citing Futo, 742 F.2d at 218, 221).

8

the level of generality at which both witnesses cast their opinions, they confused evidence of custom with the normative rules of law.  The judge doesn't need an expert to tell him the law, directly or dressed as custom.  We rejected similar testimony in Futo.[12]

Scindia read section 905(b) as placing the primary responsibility for the safety of the longshoreman upon the stevedore.  It found that "[i]t would be inconsistent with the Act to hold ... that the shipowner has a continuing duty to take reasonable steps to discover and correct dangerous conditions that develop during the loading and unloading process.  Such an approach would repeatedly result in holding the shipowner solely liable for conditions that are attributable to the stevedore, rather than the ship."[13]

IV

The United States is not liable to this severely injured worker.  Congress has allocated the duties, and we must follow.

REVERSED and RENDERED.

_____

[12]742 F.2d at 221 n.24

[13]451 U.S. at 168-69