IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 22, 2009

Charles R. Fulbruge III
Clerk

No. 08-30017

KEN ROMERO

Plaintiff - Appellant

V.

CAJUN STABILIZING BOATS INC; MR COURT

Defendants - Appellees

Appeal from the United States District Court for the
Western District of Louisiana

Before WIENER, GARZA, and DeMOSS, Circuit Judges.

PER CURIAM:[*]

A welder was injured while working on a lift boat. He challenges jurisdiction and the district court's entry of summary judgment. We affirm in part and reverse in part.

I.

In June 2005, Ken Romero, a marine welder, worked aboard M/V MR COURT ("the COURT"), a jack-up service boat owned by Cajun Stabilizing Boats, Inc. ("Cajun"). Romero worked on the vessel's rudders. He accessed the

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

job site through a manhole on the vessel's deck. He then had to climb down five or six iron supports welded into the hull. Romero had accessed the rudder room many times while working on the COURT. There was grease in the hull of the COURT, which the workers tracked onto the iron supports and the deck. Romero knew that the grease was everywhere, including his own boots. Romero's employer, Marine Industrial Fabricators, Inc. ("MIF"), placed a steel barricade around the open manhole to prevent workers from falling in. The barricade was not welded to the deck. At some point, Romero asked Cajun's owner, Thomas Kleinpeter (whom Romero referred to in his deposition as "Tommy Hebert"), for permission to weld the barricade to the deck. Kleinpeter refused.

On June 6, 2005, Kleinpeter told Romero to stop working because of rain and lightning in the area. He told Romero to begin working again once the rain stopped. Kleinpeter then left, and Romero was alone on the COURT. When the rain stopped some time later, Romero returned to work. The vessel was still greasy, and was also wet from the rain. Romero testified that Cajun's deckhands typically cleaned up the grease, but did not show up to work on the day of his accident. Romero sat at the edge of the manhole and placed his feet on the iron supports. He also used the barricade for support instead of the COURT's permanent railing, contrary to his normal practice. As he descended, his boot slipped. Romero held onto the steel barricade, but it gave way. Romero let go and fell to the floor of the rudder room, injuring his knee.

Romero sued Cajun for negligence under the Longshore and Harbor Workers' Compensation Act. See 33 U.S.C. § 905(b).[1] The district court granted summary judgment for Cajun. Romero appeals.

---

[1] Romero received no-fault worker's compensation benefits under the Act from MIF.

## II.

Romero first avers that the district court did not have jurisdiction because the COURT was not a "vessel in navigation." Before being repaired, the COURT was "practically capable of maritime transportation." See Stewart v. Dutra Constr. Co., 543 U.S. 481, 497 (2005). Kleinpeter said this in his deposition. Romero notes that the COURT was dry-docked for several weeks before his injury. This brief hiatus from service for routine repairs did not terminate "vessel in navigation" status. See Chandris Inc. v. Latsis, 515 U.S. 347, 374-75 (1995). The district court does not immediately lose jurisdiction when there is no water under the vessel's rudders. The cases relied upon by Romero are not on point. See Cain v. Transocean Offshore USA, Inc., 518 F.3d 295, 297-303 (5th Cir. 2008); Williams v. Avondale Shipyards, Inc., 452 F.2d 955, 957-58 (5th Cir. 1971). Both cases concern watercraft which had never entered active service. In contrast, the COURT was a working vessel before Romero's injury. The district court had jurisdiction.

## III.

We review a grant of summary judgment de novo, viewing evidence in the light most favorable to the nonmoving party and drawing reasonable inferences in that party's favor. See Crawford v. Formosa Plastics Corp., 234 F.3d 899, 902 (5th Cir. 2000). Summary judgment is proper if the evidence shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A vessel owes narrow duties under § 905(b) to maritime workers. See Scindia Steam Nav. Co. v. De Los Santos, 451 U.S. 156, 172 (1981). The district court held that Cajun was entitled to summary judgment on all duties. Romero now argues that there is a genuine issue whether Cajun breached the "turnover duty" and the "active control" duty.

A.

When turning his vessel over to a stevedore or marine contractor, the owner has no duty to warn of, or remedy, an open and obvious hazard. Kirksey v. Tonghai Mar., 535 F.3d 388, 392-96 (5th Cir. 2008). The hazard to Romero was open and obvious. He knew that slippery anti-corrosive compounds are common in the rudder rooms of lifts boats such as the COURT, and he was aware that the vessel was wet from the rain. Therefore, there can be no genuine issue of material fact that Cajun owed no turnover duty to warn MIF or Romero of the slippery condition, or to remedy that condition.

B.

The vessel may still be held liable "for injury caused by hazards under the control of the ship." Pimental v. LTD Canadian Pac. Bul, 965 F.2d 13, 15 (5th Cir. 1992) (citation omitted). "The vessel has a duty to 'exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation.'" Id. (quoting Scindia, 451 U.S. at 167).[2] It is no defense that the hazard was open and obvious. Id. The daily presence of the vessel's agents to apprise the progress of work or to ensure some degree of orderliness is not "active control." Fontenot v. United States, 89 F.3d 205, 208 (5th Cir. 1996) (quoting Futo, 742 F.2d at 210). The key issue is whether the work area in question has been "turned over" to the contractor. Id. In a recent unpublished opinion, we said that for an "active control" duty to arise, "the vessel must exercise active control over the actual methods and operative details of the longshoreman's work." Pledger v. Phil Guilbeau Offshore, Inc., 88 F. App'x 690, 692 (5th Cir. 2004) (unpublished) (citation omitted); see also THOMAS J. SCHOENBAUM, ADMIRALTY & MARITIME LAW § 7-10 (4th ed. 2004) (same).

---

[2] Analogous duties exist between a vessel and marine workers such as Romero. See Futo v. Lykes Bros. S.S. Co., 742 F.2d 209, 213 n.7 (5th Cir. 1984).

In Turner v. Costa Line Cargo Services, Inc., 744 F.2d 505 (5th Cir. 1984), a longshoreman slipped in an oil slick in the course of obtaining gear necessary for his work. Id. at 506-07. The crew of the vessel had been informed of the hazard, yet it did not clean the area. Id. at 508. We affirmed the district court's judgment, rendered after a bench trial, that the vessel breached an active control duty to the longshoreman. Id. at 509. The duty arose because the longshoreman had to "venture outside of the area of normal and routine cargo operations to areas within the ship's control and was forced to cross the oil slick in a location outside of his work area." Id. In Fontenot, a marine worker was injured when he slipped on a hatch covered in hydraulic oil and rainwater. 89 F.3d at 207-08. We held that the vessel owner (the federal government) did not have active control over that area because the vessel was turned over to a contractor a month earlier. Id. at 208. The contractor created the hazard and later fixed it because the vessel had no crew of its own. Id. Government agents were present on occasion, but they made only minor requests, such as asking a foreman to straighten a crooked steel wheel, and asking the contractor to "improve its housekeeping" by not leaving garbage in engine spaces. Id. Likewise, in Pimental, we held that the vessel had no active control duty to remove oil and grease from a crane housing because the area had clearly been turned over to stevedore. 965 F.2d at 15-17.

Romero testified that Kleinpeter closely supervised his work. Kleinpeter once remained in the rudder room with Romero for an entire day and instructed him on how to perform a weld. Hours before Romero was injured, Kleinpeter instructed him to stop working due to rain and lightning in the area, and to resume working once the rain stopped. Romero complied. Romero also testified that while he knew the vessel was greasy and wet, he did not clean the area up before returning to work because Cajun's deckhands normally cleaned the vessel, and it was not his "job title to do that." Another time—Romero did not specify

when—Romero mentioned the grease to Kleinpeter, and Kleinpeter said it was "no problem." These assertions, which we must accept as true at this stage, suggest that Cajun retained "active control" of the work area. Kleinpeter was not merely an occasional presence on the COURT; he closely oversaw and directed "operative details" of Romero's work. See Pledger, 88 F. App'x at 292. Kleinpeter also made decisions affecting the safety of Romero's work area. Cajun provided the deckhands who cleaned the vessel; there is no indication that MIF was ever put in charge of keeping the work areas clean. Cf. Fontenot, 89 F.3d at 208. And, like the longshoreman in Turner, Romero had to traverse greasy and wet areas which had not been turned over to MIF in order to reach his work site. See 744 F.2d at 509. These allegations create a genuine issue of fact as to whether Cajun had active control of the vessel and Romero's work area.

Cajun's counter-arguments are unpersuasive. Cajun notes that Romero was alone on the COURT when he was injured. Just as a duty is not triggered by the mere presence of the vessel's agent, we do not believe that an active control duty switches off the minute the agent leaves. Cajun also suggests that Romero alone decided to return to work. This ignores Romero's statement that Kleinpeter had previously instructed him to return to work after the rain ceased. Cajun also says that MIF erected and maintained the barricade. However, at some point, Romero asked Kleinpeter if he could weld the barricade to the deck, and Kleinpeter refused.[3] The record, consisting chiefly of Romero's deposition, is sparse. However, we believe that Romero has presented sufficient evidence to create a fact question as to whether Cajun owed him an active control duty under § 905(b) and breached such duty.

---

[3] Romero was asked by his attorney: "I want to be real clear about something. This idea of welding down barricades, you talked to Tommy about that before the accident, didn't you?" Romero answered: "Yeah."

IV.

We hold that federal jurisdiction exists in this case, and that, as a matter of law, Cajun did not owe Romero a turnover duty to warn him of the slippery conditions on the vessel. However, Romero's deposition demonstrates that there is a genuine issue of material fact of whether Cajun retained active control of part or all of the COURT.

AFFIRMED in part, REVERSED in part, and REMANDED.