# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 20, 2013

No. 12-60104

Lyle W. Cayce
Clerk

BRIAN J. LANDRY,

Plaintiff–Appellant

v.

G.C. CONSTRUCTORS, a Joint Venture,

Defendant–Appellee

Appeal from the United States District Court
for the Southern District of Mississippi
U.S.D.C. No. 1:10-CV-25

Before HIGGINBOTHAM, CLEMENT, and HAYNES, Circuit Judges.

PER CURIAM:[*]

Plaintiff-Appellant Brian Landry appeals from the district court's grant of summary judgment in favor of Defendant-Appellee G.C. Constructors, a Joint Venture ("G.C."), on his negligence claims brought under the Longshore and Harbor Workers Compensation Act ("LHWCA"), 33 U.S.C. § 901, *et seq.* Because Landry fails to show in this "dual-capacity" case that G.C. as vessel owner assumed an obligation to make safe a condition caused by equipment controlled by G.C. as contractor, we AFFIRM.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-60104

## I. Facts and Procedural History

In the aftermath of Hurricane Katrina, G.C. procured a contract to help rebuild the Biloxi Bay Bridge. Landry worked for G.C. as a crane operator assigned to Crane Barge 113 (the "Barge"), known to G.C. employees as the "Red Triple 8" because of its red Manitowoc Model 888 crane (the "Crane"). G.C. characterizes the Barge as a "dumb barge" that lacked its own crew.[1] G.C. provided the Barge in its capacity as vessel owner and leased the Crane from a member of the Joint Venture.[2] The Crane was mobile, but the record shows that it was secured to the Barge in a single position throughout the project.

The Crane developed a hydraulic leak. Landry logged the condition in his daily report and also notified foreman Shane Grisham and mechanic Wesley Odom, but the leak went unrepaired. After a few months, the hydraulic fluid became "embedded" in the Crane's steel, despite occasional clean-up attempts. The leak also caused fluid to cover areas of the Barge within the Crane's "swing radius." Keeping the Barge's deck free of fluid required frequent attention, and some workers slipped in the conditions.

Landry exercised his authority to shut-down the Crane and refused to continue operating it until Odom took his concerns to a higher level. Odom agreed that the leak was hazardous, and he reported this assessment to G.C.'s "Pile Driving Superintendent," David Wedge, and "Equipment Superintendent," Harvey Rush. According to Landry, both Grisham and Odom reported that "the

---

[1] "Barges are vessels, but of a peculiar kind. Lacking power and usually crew, barges depend upon another vessel, a tug, for movement." *See Agrico Chem. Co. v. M/V Ben W. Martin*, 664 F.2d 85, 90 (5th Cir. 1981) (internal citation omitted).

[2] Landry argues that G.C. as contractor owned the Barge *pro hac vice*, but that would not alter the relevant allocation of duties. A transfer of the Barge from G.C. as vessel owner to G.C. as contractor would be a "demise or bareboat charter," which generally imposes on vessel owners only the obligation to "furnish a vessel in seaworthy state" at the time of delivery. *Agrico*, 664 F.2d at 91. A demise or bareboat charterer assumes the role of vessel owner during the duration of the charter, *id.* at 90-91, but that just proves that G.C. as contractor assumed responsibility for vessel maintenance.

office" refused to take action because any repairs would take the Crane offline and delay the project. G.C. stood to gain a $5 million bonus if it completed the project by a specified time, but it would have incurred a penalty for each day that construction ran beyond that deadline.

Landry later slipped on the Crane's tracks and fell to the Barge's deck, injuring his back. He blamed the injury on "a black spot" of hydraulic fluid, but he acknowledged that it had rained that morning. Pursuant to a stipulation between the parties, the Department of Labor found Landry's injuries covered under the LHWCA and ordered G.C. to make compensation payments.

Landry also sued G.C. for negligence in its capacity as the Barge's owner. G.C. moved for summary judgment, and Landry responded primarily with deposition testimony from himself, Grisham, G.C.'s corporate representatives, and a safety expert. The district court concluded that Landry presented no evidence that G.C. had breached its duties under *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156 (1981), and granted summary judgment for G.C.

The day before that ruling, Landry obtained an affidavit from Odom that implicated Wedge and Rush in the events leading to Landry's injury. Neither party knew of Odom's whereabouts during discovery, and Landry located Odom only by chance shortly before the court's ruling. Landry used Odom's affidavit as the basis for a motion to alter or amend judgment, which the district court denied. Although Landry adequately explained the affidavit's untimeliness, the court reasoned that Odom's testimony did not show that any G.C. employee acted as an agent for G.C. as vessel owner. Landry timely appealed.

## II. Guiding Principles

In exchange for providing workers' compensation payments, the employers of workers covered by the LHWCA generally have statutory immunity against tort claims brought by their employees. *Scindia*, 451 U.S. at 165. Such workers, however, retain the ability to bring third-party suits against vessel owners. *Id.*

No. 12-60104

at 165-66; *see also* 33 U.S.C. § 905(b). This includes suits against "dual capacity" employers simultaneously acting as both employer and vessel owner. *See Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 530-32 (1983).

The LHWCA, however, generally preserves "the rightful expectation of the vessel that the stevedore [will] perform his task properly without supervision by the ship." *Scindia*, 451 U.S. at 170. "Once stevedoring operations have begun, the owner has no duty to supervise or inspect the work and must only take care to prevent unreasonable hazards." *Levene v. Pintail Enters.*, 943 F.2d 528, 533 (5th Cir. 1991). Vessel owners thus have responsibility for fulfilling three, limited duties: the "Turnover Duty," the "Active-Control Duty," and the "Duty to Intervene." *See Scindia*, 451 U.S. at 164-76; *Gravatt v. City of New York*, 226 F.3d 108, 115-21 (2d Cir. 2000). Only the latter two are at issue here.

The "Active-Control Duty" makes a vessel owner liable for injuries that arise out of its attempts to "actively involve[] itself in [stevedoring] operations." *Scindia*, 451 U.S. at 167. Similarly, "even where the vessel [owner] does not actively involve itself in the stevedoring operations, it may be liable 'if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the *active control of the vessel* during the stevedoring operation.'" *Gravatt*, 226 F.3d at 121 (quoting *Scindia*, 451 U.S. at 167). Otherwise, "[o]nce stevedoring or repair operations have begun, it is the *stevedore*, not the shipowner, who assumes the responsibility for the safety of its employees." *Futo v. Lykes Bros. S.S. Co.*, 742 F.2d 209, 215-16 (5th Cir. 1984).

Additionally, vessel owners are subject to the "Duty to Intervene" when they have "actual knowledge" of both a hazard on the ship or with its "equipment" *and* a stevedore's "improvident" decision to proceed despite the unsafe condition. *Gravatt*, 226 F.3d at 121 (citing *Scindia*, 451 U.S. at 175-76); *see also Castorina v. Lykes Bros. S.S. Co.*, 758 F.2d 1025, 1032 (5th Cir. 1985)

4

(requiring actual knowledge of the "dangerous condition and of the stevedore's unreasonable conduct in dealing with" it). This duty focuses on the vessel owner's knowledge; neither the worker's knowledge of the hazard nor its "open and obvious" nature "precludes his recovery." *Treadaway v. Societe Anonyme Louis-Dreyfus*, 894 F.2d 161, 167 (5th Cir. 1990). Generally, the Duty to Intervene does not arise for "open and obvious transitory condition[s] . . . that [are] created entirely by the independent contractor, [are] under its control, and relate[d] wholly to its own gear and operations." *Futo*, 742 F.2d at 216.

Analyzing alleged *Scindia*-duty violations becomes particularly difficult when, as here, the case requires parsing whether a dual-capacity employer has been negligent in its capacity as contractor or as vessel owner. *See Gravatt*, 226 F.3d at 121-25. If the former, LHWCA compensation payments provide injured workers their exclusive form of recovery. *See id.* at 125 ("The negligence of the employer's agents, acting in tasks constituting harbor-work employment, may not be imputed to their employer in its capacity as vessel owner."). If the latter, however, the worker may collect compensation payments from the employer in its contractor capacity and also pursue otherwise-barred tort remedies against the employer in its capacity as vessel owner. *See, e.g.*, *id.* at 119-20 (citing, *inter alia*, *Jones & Laughlin*, 462 U.S. 523).

The matter becomes even more "elusive" when a dual-capacity employer's workers also act in a dual capacity as both stevedores and vessel crew. *Morehead v. Atkinson-Kiewit, J/V*, 97 F.3d 603, 610 & n.11 (1st Cir. 1996) (en banc). In such cases, "a court may have to divide the employer-shipowner into a hypothetical independent employer and independent vessel owner, each separately holding the duties allocated under principles suggested in *Scindia*." *Id.* at 613. Even then, "the duties and work arrangements pertaining to a suing harbor worker may be so foreign to those in *Scindia*'s stevedoring context that *Scindia*'s analysis will become no more than a point of departure. Nonetheless,

*Scindia*'s general approach, at least, can be followed, and, in many cases, some or all of its express analysis may be usable." *Id.*

That approach requires courts to avoid imposing "heightened" or "diminished" duties on dual-capacity vessel owners. *Castorina*, 758 F.2d at 1033. Even in the case of dual-capacity vessel owners, "the stevedore's knowledge of dangerous conditions that may have arisen during the cargo operations should not be imputed to the shipowner, nor should the shipowner be deemed to know that the stevedore's actions in dealing with such dangers are obviously improvident." *Id.* Under *Scindia*, "the stevedore—or, in a dual capacity case, the employer in a stevedore capacity—is ordinarily liable for the safety of the workplace and for any injuries that occur." *Morehead*, 97 F.3d at 614. This principle reflects policy concerns that militate against a "'functional' interpretation" of dual-capacity employees' duties that would hinge a vessel owner's LHWCA liability on "the duties being performed by the covered employees at any given time." *Id.* at 615; *see also id.* ("We would be disregarding Congressional intent and might even be returning in the direction of the [defunct] *Sieracki* doctrine which did not require such a showing [of vessel-owner fault] if we were to attribute some of the regular duties that a harbor worker is employed to perform to the vessel, because of their speculative seaman-like character, and only the residue to the employer. This approach would greatly expand a defendant's liability qua vessel in a work arrangement not too different from that in *Scindia*, *i.e.*, one where the employees have effectively taken over the vessel to carry out their employment duties under their employer's supervision.").

### III. The District Court's Summary Judgment Ruling

We review a grant of summary judgment *de novo*, construing the evidence in the light most favorable to the nonmoving party. *United Fire & Cas. Co. v. Hixson Bros.*, 453 F.3d 283, 284-85 (5th Cir. 2006). "Unsubstantiated assertions,

No. 12-60104

improbable inferences, and unsupported speculation," however, "are not sufficient to defeat a motion for summary judgment." *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003). Summary judgment is appropriate if the moving party can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To survive summary judgment, Landry was required to introduce sufficient evidence to create a material fact issue as to at least one duty. *See Pimental v. Ltd. Canadian Pac. Bul*, 965 F.2d 13, 15-16 (5th Cir. 1992).

### A. Duty to Intervene

Whether Landry creates a fact issue concerning the Duty to Intervene presents a close issue. He contends that, even if G.C. exercised its authority to refuse repairs in its contractor capacity, evidence shows that G.C. as vessel owner had knowledge of both the leak and the contractor's decision to proceed despite the hazard. In Landry's view, G.C. conceded below that he sufficiently informed it of the leak and the need to make repairs, and that the leak was a potentially hazardous condition. He asserts that at least one of the individuals involved in the decision to refuse repairs acted as an agent of G.C. in its vessel-owner capacity.

Even accepting Landry's arguments in this respect, he needed to show "something more" under the circumstances. In *Futo*, we synthesized *Scindia* and pre-*Scindia* circuit precedent and explained that vessel owners may have no Duty to Intervene even if they know of a dangerous condition and an unreasonable response. *See* 742 F.2d at 220-21. A plaintiff must show "something more" when a contractors' employees create "open and obvious" hazardous conditions in an area or with equipment under their exclusive control. *Id.* at 215. Notably, this "'something more' inquiry" extends to consideration of whether the "condition involves the ship itself, its gear, or equipment," *id.*, or instead concerns an "open and obvious transitory condition . . . that is created

7

No. 12-60104

entirely by the independent contractor, is under its control, and relates wholly to its own gear and operations." *Id.* at 216. This factor may be "determinative."[3] *Id.* at 215 n.10.

The "something more" approach has been distilled into a "six factor test." *Fontenot v. United States*, 89 F.3d 205, 209 (5th Cir. 1996). It examines

> (1) whether the danger was open and obvious, (2) whether the danger was located in the ship or ship's gear; (3) which party created the danger or used the defective item and was therefore in a better position to correct it; (4) which party owned and controlled the defective item; (5) whether an affirmative act of negligence or acquiescence in the use of a dangerous item occurred; and (6) whether the shipowner assumed any duty with regard to the dangerous item.

*Id.* (citing *Casaceli v. Martech Int'l, Inc.*, 774 F.2d 1322 (5th Cir. 1985)). The six factors are not exhaustive; we apply a "broad[] and more flexible approach" to Duty-to-Intervene issues. *Futo*, 742 F.2d at 215. That includes analyzing any "'pertinent statutes, regulations, or custom.'" *Fontenot*, 89 F.3d at 209 (quoting *Scindia*, 451 U.S. at 175-76).

---

[3] Some cases have considered "something more" to simply mean *Scindia*'s requirement that the shipowner have actual knowledge of an "obviously improvident" decision to continue operations. *See Greenwood v. Societe Francaise De*, 111 F.3d 1239, 1249 (5th Cir. 1997). *Futo* is clear, however, that—at least where the contractor creates an open and obvious hazard and retains exclusive control over the relevant area or equipment—"something more" refers to an additional showing beyond actual knowledge of the hazard and the improvident decision. *See* 742 F.2d at 221 (holding that shipowner had no duty to intervene "even if it possessed the full measure of actual knowledge required by *Helaire* [*v. Mobil Oil Co.*, 709 F.2d 1031 (5th Cir. 1983)]"); *id* at 220 n.22 ("The knowledge referred to in *Helaire* includes knowledge that the stevedore will not act to protect the longshoreman."); *id.* at 220 ("Under *Helaire* and *Scindia*, the shipowner, before being liable for failure to intervene in protection of the longshoreman, must, *inter alia*, have actual knowledge 'that a dangerous condition exists and actual knowledge that the stevedore is not acting to protect the longshoreman.' . . . [T]he appellant here has failed to meet these requisites and, therefore, cannot recover against the shipowner, *even if such knowledge were alone a sufficient basis on which to impose a duty of shipowner intervention in the present context.*" (emphasis added) (internal citation omitted)); *see also Casaceli v. Martech Int'l, Inc.*, 774 F.2d 1322, 1327 (5th Cir. 1985) ("The *Futo* court found that the *Scindia* exception 'does not . . . extend to an open and obvious transitory condition' created and controlled by the independent contractor, and wholly related to the contractor's gear and operations." (citation omitted)).

8

An analysis of these factors does not support reversal. Landry admits that he knew of the "open and obvious" leak. The slippery conditions were sometimes present and sometimes cleaned-up—i.e., "transitory." As discussed in more detail below, the Crane was not part of the ship's usual "gear" or the ship itself. The evidence also shows that only G.C. employees involved in bridge-building used and controlled the Crane, and that Landry's injury occurred on the Crane as he prepared to use it for construction-related purposes. *See id.* at 208-09 (holding that a vessel-owner satisfied its duty to intervene in a case involving similarly open and obvious transitory conditions caused by "hydraulic oil").

The parties provide limited argument on whether the Crane should be considered part of the Barge's "equipment" or otherwise "owned" by G.C. as vessel owner. Landry believes that, because the Crane was "affixed" to the Barge, it was a vessel "appurtenance" under the control of G.C. as vessel owner. If it was, *Futo* suggests that G.C. as vessel owner had the responsibility to repair the leak. However, G.C. leased the Crane for construction work, and Landry operated it as such. One cannot say, then, that the Crane was used by G.C. as vessel owner rather than as contractor. *See Futo*, 742 F.2d at 215-16; *cf. Lewis v. Timco, Inc.*, 697 F.2d 1252, 1256 (5th Cir. 1983) (rejecting plaintiff's claim against a vessel owner where the "defective equipment . . . was not part of the [vessel's] regular gear," and the vessel owner "neither controlled nor created the circumstances which led to [the plaintiff's] injury"), *abrogated on other grounds by Lewis v. Timco, Inc.*, 716 F.2d 1425 (5th Cir. 1983) (en banc). Under *Futo*, this evidence shows that G.C. as contractor "created the hazard and was in the better position to correct it" and that the Crane "was not an appurtenance of the ship but was rather a temporary structure . . . used entirely by the independent contractor to perform its work." 742 F.2d at 218.

Even if some G.C. employees could be viewed as dual-capacity employees, Landry must show that G.C. as vessel owner had "some relevant assumption of

duty" to displace G.C. as contractor's responsibility for maintaining the Crane, *id.* at 216, such as a custom whereby vessel owners maintain cranes attached to dumb barges. Landry points to no evidence establishing such a duty. The record also shows that another entity provided the Crane and that it was brought onto the Barge for construction-related purposes for the duration of the bridge-building project. Landry's accident, moreover, occurred on the Crane's tracks and not the Barge's deck, which more plausibly might be viewed as part of the vessel and the responsibility of G.C. as vessel owner. *Cf. Levene*, 943 F.2d at 535 ("The cases in which we have found such control by the vessel owner as to impose a duty generally have involved dangerous conditions on the owned vessel itself."). On this record, G.C. as vessel owner assumed no duty as to the Crane's tracks.

*Futo* indicates that vessel owners—even those with actual knowledge of a hazardous condition and a contractor's obviously improvident decision to continue operations—generally have no duty to intervene with respect to equipment brought on board by the contractor and under its control. *See* 742 F.2d at 221 ("Here, the hazard . . . was a temporary structure, not a part of the ship itself, its gear, or equipment, which was created and used entirely by the independent contractor, who both owned and controlled it. Nothing that the shipowner did, and nothing about the ship itself, or any operation of it, contributed to the hazard. The shipowner had assumed no duty in respect to the [structure]. The danger posed was open and obvious to the contractor and its employees, and the contractor was in the best position to correct it."); *cf. Fontenot*, 89 F.3d at 209 ("[T]he danger of oil on the wet hatch covers was open and obvious, and was not created by ship gear controlled by the vessel owner. Nor was there a defect in the vessel. . . . This operation was under the exclusive control of the contractor, [plaintiff's] employer."). Landry fails to present

No. 12-60104

evidence showing that G.C. as vessel owner had a duty to intervene and repair the Crane under the "*Casaceli* factors" discussed in *Fontenot*.

### B. Active-Control Duty

As to G.C.'s Active-Control Duty, Landry contends that G.C. exercised active control over the Barge and "its gear and equipment" in its capacity as vessel owner by providing "a separate crew of vessel maintenance workers." He distinguishes these workers from "construction crew" employees of G.C. as contractor. Because repairs to the Crane would have been made by these alleged "vessel-maintenance workers" and approved by their supervisors, Landry reasons, G.C. must have acted as a vessel owner with active control over the Barge and Crane when it refused to repair a known dangerous condition.

As suggested by the above discussion, however, the record does not bear out Landry's Active-Control theory of liability. Landry's evidence does not establish that G.C. provided a separate crew of workers dedicated to maintaining only vessels. The record instead shows that dual-capacity G.C. employees, including Landry, sometimes did work that could be characterized as potentially vessel-related maintenance, such as cleaning the Barge's deck, and that they were aware of the hydraulic leak. Odom, for example, never worked on "actual construction of the Biloxi Bay Bridge," but his "duties included maintenance, inspection, and repair of the vessels and equipment involved" in the project as a whole. He knew of the leak, reported Landry's concerns up the chain-of-command, and would have performed Landry's requested repair.

However, a vessel owner does not violate the Active-Control Duty simply because a hazard develops during stevedoring operations or because that hazard must be remedied in areas of the ship that might at other times be under the vessel owner's control. *See Pimental*, 965 F.2d at 16 ("Liability based on this exception is not relieved when the hazard is open and obvious. If, however, a vessel has relinquished control over an area to the stevedore, then it is the

11

primary responsibility of the stevedore to remedy a hazard in that area."
(citations omitted)).  Thus, the fact that G.C. employees who engaged in
contractor-related work also sometimes maintained the Barge and Crane does
not necessarily make them employees of G.C. as vessel owner.  *See Morehead*,
97 F.3d at 615.  Similarly, the presence of G.C. employees who might have been
responsible for carrying out vessel-related repairs does not mean that G.C. as
vessel owner necessarily exercised control over the Barge and Crane during
bridge-building operations.  *See Pimental*, 965 F.2d at 16-17 (affirming directed
verdict for vessel owner despite evidence suggesting that its employees cleaned
work area of oil and grease during stevedore operations; "[T]he crane and the
crane housing were not under the active control of the vessel; the crane and the
crane housing [were] areas that were turned over to the stevedore" at the time
of injury.).

On this record, there is no basis for concluding that G.C. as vessel owner
attempted to "actively involve" itself in G.C. as contractor's construction
operations or to exercise "active control" over the Crane.  *See Scindia*, 451 U.S.
at 167; *Gravatt*, 226 F.3d at 121.  Indeed, the record shows that G.C. as vessel
owner handed the unmanned Barge over to G.C. as contractor; that Landry and
others construction workers effectively assumed control of the barges as
employees of G.C. as contractor; and that Landry was injured on equipment
provided by and under the control of G.C. as contractor.[4]  *See Morehead*, 97 F.3d
at  613-14.  Although some employees, such as Odom, potentially could have

---

[4] Our case law also suggests that the decision to rush work in the face of potentially
dangerous conditions speaks to the negligence of the party who stands to benefit from that
course of action.  *See Pichoff v. Bisso Towboat Co.*, 748 F.2d 300, 303 (5th Cir. 1984)
(concluding that dual-capacity defendant could be held liable as vessel owner where its agent
required a "worker[] to perform [his] job[] hurriedly despite unsafe working conditions" so that
the vessel owner would not "lose money" by failing to meet a deadline).  Here, the bonus for
timely completion of the construction project suggests that G.C. as contractor stood to benefit
from keeping the Crane in service.  That, in turn, suggests that it is more appropriate to view
G.C. as contractor as responsible for the consequences of failing to repair the Crane.

worked in a dual capacity as employees of both G.C. as vessel owner and G.C. as contractor, nothing suggests that they were engaged in vessel-related maintenance tasks at the time of the accident or that the Crane's repair—as opposed to repair of the Barge proper or its equipment—would have qualified as vessel-related maintenance. *See Levene*, 943 F.2d at 535 ("The cases in which we have found such control by the vessel owner as to impose a duty generally have involved dangerous conditions on the owned vessel itself . . . . There is no evidence that [the vessel owner] had any responsibility for the condition of the [area where the injury occurred].").

Under these circumstances, a vessel owner may rely on the stevedore to make-safe his workplace and any contractor-provided equipment. *See Futo*, 742 F.2d 215-16. To construe Landry's evidence otherwise would be to impose a heightened standard of liability on a dual-capacity vessel owner, which we may not do. *See, e.g.*, *Morehead*, 97 F.3d at 615; *Castorina*, 758 F.2d at 1033. Landry therefore fails to raise a fact issue on whether G.C. violated the Active-Control Duty by refusing to repair the Crane. *See Fontenot*, 89 F.3d at 208 (holding that Active-Control Duty was not violated when "the entire [unmanned] vessel had been turned over to the contractor over a month before the accident").[5] Accordingly, the district court appropriately granted summary judgment for G.C.

---

[5] *See also Morehead*, 97 F.3d at 613-14 ("Both types of activities—construction and [vessel-related] work—were assigned to [the employees] and were performed for [the joint-venture] qua employer. Workers like [plaintiff] received their daily instructions from [the joint-venture's] carpenter-foremen, while [its] project safety manager met periodically with them to discuss site-specific safety issues. Therefore, *Scindia*'s principle of limited liability of the vessel sensibly and logically applies, because the employees effectively assumed control of the barges working under [the joint-venture] in its capacity as their employer. [The joint-venture] qua shipowner had no separate captain and crew assigned to the barge. The allegedly negligent conditions . . . were not attributable to the errors of separate maritime agents acting specifically for the vessel. Rather the alleged acts of negligence were those of fellow harbor workers acting within the scope of their daily employment for the [joint-venture as contractor].").

No. 12-60104

## Conclusion

For the above reasons, we AFFIRM the district court's grant of summary judgment in G.C.'s favor.[6]

---

[6] Because our analysis accepts the allegations in Odom's affidavit, we need not decide whether the district court erred in denying Landry's motion to alter or amend judgment.